### THE ST. LOUIS.

(Circuit Court of Appeals, Second Circuit. December 7, 1899.)

#### No. 37.

COLLISION—EVIDENCE CONSIDERED—BURDEN OF PROOF.

Where a steam ferryboat, navigating in a fog at night, on hearing the fog signal of another vessel, apparently forward of her beam, which was recognized by her pilot as that of another ferryboat, whose course was such as to cause danger of collision, failed to stop her engines at once, as required by article 16 of Act June 7, 1897, the burden rests upon her to show that the collision which followed was not due to her neglect.

Appeal from the District Court of the United States for the Eastern District of New York.

H. Galbraith Ward, for appellant.

Geo. B. Adams, for appellee.

Before WALLACE and LACOMBE, Circuit Judges.

PER CURIAM. We are not satisfied that the collision between the two ferryboats was caused by any fault on the part of the St. Louis, and therefore conclude that the libel should have been dismissed because its allegations were not established by the preponderance of evidence, which must be produced by the party having the onus of proof. The Grace Girdler, 7 Wall. 196, 19 L. Ed. 113.

The vessels collided in a dense fog when both had for some little time been feeling their way cautiously, and giving fog signals frequently, while pursuing their customary routes on the river. The Delaware was on a course heading about N. E., going on the first of the flood tide, when her pilot, who was at the wheel, heard the fog signal of a vessel directly ahead, or a little on her starboard bow, which he recognized as that of the St. Louis. Her lookout at

the same time sung out, "Boat ahead." Shortly afterwards her pilot heard the signal again, and immediately stopped and reversed his vessel, and gave alarm signals; but the St. Louis appeared through the fog, a short distance away, and the two vessels came into collision,—the port bow of the St. Louis with the port bow of the Delaware. The St. Louis was going at about the same speed as the Delaware, and sounded her whistle every 30 seconds. Her pilot heard a fog signal, which he recognized as that of the Delaware, so nearly ahead that he immediately stopped and reversed his vessel, at the same time putting his wheel hard a-port. The vessels came together with force enough to carry away some of the railing and stanchions of the Delaware's port bow, and break some of her deck posts, and to turn the bow of the Delaware around several points to port. The deck of the St. Louis was somewhat higher than that of the Delaware, and as the vessels came together she apparently rode upon the bow of the Delaware, turning the Delaware in her own direction until the impact was released. The blow was not strong enough to throw down any of the passengers who were standing at the time on the decks of the two vessels, at their port bows. The St. Louis was not injured, and the injuries to the Delaware were inconsiderable. The facts as stated in respect to the navigation of each vessel appear by the testimony of her own officers and men in charge at the time, there being no other witnesses thereto in behalf of either.

The learned district judge was of the opinion that the evidence would not have warranted a decree against the St. Louis, except for the testimony of a passenger on the Delaware, and the circumstance that the Delaware was carried so far to port by the impact; but giving force to the testimony of the passenger, and the effect of the impact, he concluded that the St. Louis must have been moving too rapidly to be under the due control obligatory upon a vessel navigating in a fog. We are not impressed with the value of the passenger's testimony, although he was an intelligent and candid witness. He was standing at the Delaware's port bow, leaning upon the rail at the point where it was carried away by the collision, and his attention was attracted by the signals and the bells to reverse. He states:

"Just about as she [the Delaware] started to reverse, the other boat came into view, and ran right into her. I knew she [the St. Louis] was going unusually fast for a foggy night. I could tell by the time it took her from the time I saw her until she came on us. I saw her fifty or seventy-five feet, I should think. I knew we were coming very slowly,—at least, I thought so. She [the Delaware] must have lost her headway and gone the other way, because I could feel the jar of the backward motion."

Manifestly, the witness was speaking from impressions rather than from any tangible, evidential facts. The time for observation consisted of the few seconds, fraught with apprehension and excitement, that intervened between the time he saw the St. Louis, 50 or 75 feet away, and the time the vessels came together. He assumed that the vibratory motion of the Delaware, incidental to the reversal of her engine, was caused by the backward motion of the

vessel; and, assuming this, no doubt believed that the St. Louis was coming ahead sufficiently fast to run down the Delaware when she was retreating. The opinion of a nautical man under similar circumstances would be of little probative weight, and that of a nonexpert ought not to be entitled to as much.

The circumstance that the Delaware was swung to port by the collision does not authorize any safe inference that the St. Louis was not stopped as promptly or effectually as possible, or that she was previously going at immoderate speed. She was swung to port because she was in fact pushed or pulled in that direction by the bow of the St. Louis as it rode against her bow; and it would seem that this might have happened if she had been in motion and the St. Louis nearly stopped, as well as if she had been nearly stopped and the St. Louis in motion. There is nothing in the testimony to throw any light upon the matter, and any conclusion rests altogether upon conjecture.

The Delaware did not comply with the rule prescribed by article 16 of the act of June 7, 1897, that:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

In the present case the pilot of the Delaware was aware, on hearing the first signal of the St. Louis, that the situation was one requiring the greatest caution. He knew the customary course of the St. Louis, knew it was her signal, and knew that there was a strong chance that the vessels might come in contact if both kept on. Under these circumstances, it was imperative upon him, under the rule, to stop until the position of the St. Louis was definitely ascertained. Indisputably, he did not stop, but waited before doing so until he heard the second signal. As the signals of the St. Louis were being sounded, this was an interval of 30 seconds. Of course, if the Delaware was reversed so that she was going backward in the water when the collision took place, and the St. Louis was not going at a moderate rate of speed, it cannot be held that the fault of the Delaware was contributory to the collision. The Umbria, 166 U. S. 404–421, 17 Sup. Ct. 404, 41 L. Ed. 1053. But the case is one for the application of the rule in collision, that, whenever it appears that one of the vessels has neglected the usual and proper measures of precaution, the burden is upon her to show that the collision was not owing to her neglect. The Great Republic, 23 Wall. 20, 23 L. Ed. 55. The decree is reversed, with instructions to the district court to dismiss the libel, with costs. Costs of this court are awarded to the appellant.