## THE WEST BROOKLYN.

### THE WILLIAM FLETCHER.

(District Court, E. D. New York. July 9, 1900.)

COLLISION—STEAM VESSELS IN FOG—EVIDENCE CONSIDERED.

Evidence in support of a libel and cross libel for collision considered. and *held* insufficient to show that a collision between two steamers in East river during a fog was due to negligent navigation on the part of either vessel, and both the libel and cross libel dismissed.

In Admiralty. Libel and cross libel for collision.

Wilcox, Adams & Green, for the William Fletcher.
James J. Macklin, for the Ferry Co.

THOMAS, District Judge. The Fletcher is a passenger steamboat, 135 feet in length, with a speed capacity of about 10 or 11 miles per hour. On the 12th day of October, 1899, being under charter to carry the guests of Sir Thomas Lipton from the barge office in the city of New York to the locality of the international yacht races, she started at about 10 minutes of 8 a. m., having been delayed about 20 minutes by the fog. The vessel started by working her engine slowly, increased her motion to full speed, and shortly reduced it to half speed, which, according to the description of her crew, was about 4 or 4½, and in a fog about 3, miles per hour. She had proceeded about six or seven minutes on her way, when the fog thickened so that it was impossible to see a vessel over 50 feet away, and she gave usual and proper fog signals. After being out about 10 minutes, and hearing many whistles behind her, there was one long whistle on her port bow, which was heard and reported by the lookout, and was also heard by the mate, who was in the pilot house. Thereupon she immediately gave one whistle, stopped, reversed, and sounded alarm whistles, as she claims, at the same time porting her wheel so as to carry her from her then compass course of west-southwest to about west. Shortly she saw the West Brooklyn some 30 to 40 feet away from her stem, partly across her bow, and, knowing that a collision was inevitable, she starboarded for the purpose of throwing her head to port, and thereby lightening the contact; but this was ineffective, and the West Brooklyn struck the Fletcher on the starboard bow, and swung her about three or four points, injuring her port side. The West Brooklyn also was injured. The Fletcher's pilot, her lookout, and other members of the crew state that they did not hear other than the one whistle above described from the West Brooklyn. Lord Beresford, an English admiral, was sitting aft of and leaning against the pilot house. He states that in crossing the channel he did not think the Fletcher was going fast, but did not pay much attention, because he was reading his paper; that the Fletcher blew the ordinary amount of whistles sounded in a fog; that his attention was first called to the West Brooklyn by the Fletcher's engines stopping, and directly thereafter he heard the crash; that he first actually saw the West Brooklyn in collision; that he thought her wheels "were going ahead when we struck," but could not swear to it; that the Fletcher's bow went under the sponson beam and hit the paddle of the West Brooklyn, the former hitting the latter about a couple of points before the beam; that "she stopped before she struck, I think, because what first made me look up was stopping the engine, and it was almost directly after that I heard the crash." Mr. Barrie, in charge of Lord Lipton's party, testified that he was on lookout on the port side of the pilot house; that the Fletcher proceeded slowly, blowing whistles; that after getting out he heard other whistles; that his attention was called to the ferryboat almost simultaneously with the crash; that he heard a whistle from the West Brooklyn; that the Fletcher's engines were reversed before the collision; that the West Brooklyn came in sight about 40 or 50 feet away; that he could not speak of the movement of the other boat. The evidence on the part of the crew of the Fletcher is that the

West Brooklyn was moving with considerable speed, and that the Fletcher was making but little, if any, headway at the time of the collision; that the West Brooklyn was headed at the time about north by east, and the stem of the Fletcher came in contact with her starboard bow about 30 feet aft of the stem, and raked along the West Brooklyn's side, tearing away some of the braces, and finally lodging in the wheel in such a way as to do it considerable damage, in which injury the port side of the Fletcher shared; that the motion of the starboard paddle wheel of the West Brooklyn was forward as it scraped the port side of the Fletcher in a downward direction. It may be noticed here that the evidence on the part of the West Brooklyn tends to show that the motion of the paddle wheel was upward, as evidenced by the manner in which portions of the wheel were broken. The lookout of the Fletcher—Johnson, a Norwegian, a good witness—testified that he, with another person, was on lookout some four feet aft of the stem, and that he saw the paddle wheel of the West Brooklyn moving forward, although he turned away for safety before the collision. Hopkins, a Sandy Hook pilot engaged to take out the Erin, Lord Lipton's boat, was in the pilot house, looking forward. He confirms the evidence of the crew of the Fletcher as to the general conditions of weather, as to her half speed, the fog whistles blown by the Fletcher, the West Brooklyn's whistle, which appeared near by. He stated that he could not say whether the Fletcher had lost headway, but that she had not much headway; but he asserted that the West Brooklyn had headway. He did not seem to recall definitely the whistles. The witness seemed to be fair in his statement, but did not remember details with much accuracy. Tiffany was one of the lookouts ahead on the Fletcher, and coincided with the master of the Fletcher in his general statement. Buzzee, the fireman, stood on the deck on the port side, about 30 feet from the stern. He testified to hearing the whistles of the Fletcher, but he, as well as the other members of the crew, testified that they heard no whistles ahead of them until the loud whistle from the West Brooklyn. He states that the West Brooklyn was going ahead, which he judged from the motion of the wheels.

The evidence on the part of the West Brooklyn is as follows: She left her berth at Thirty-Ninth street, Brooklyn, at 7:30. The weather was hazy at the time of starting, but hardly to be characterized as foggy. She came along to the bell buoy near the Buttermilk Channel, at which point the fog closed in thick. She had been going at her usual speed, but at that point reduced to half speed, and proceeded, the lookout reporting the bell of a schooner anchored on the west side of Governor's Island. Shortly after passing the schooner, and while yet on a northern course by compass, she heard a whistle, which she took to be about one point on her port bow. Upon a repetition of the whistle she stopped, for the purpose of locating it, having, however, changed her course to north by east. She continued blowing her whistle, making little, if any, headway forward, with her engines stopped. She claims that the whistles on the port hand were not those of the Fletcher, and that two or three

minutes after the collision the Atwater came from that direction, and therefore she ascribes the whistle to that boat. After the West Brooklyn had been lying still in the water close to a minute, the Fletcher came in sight, moving at rapid speed, and struck the West Brooklyn on her starboard bow, about 30 feet off from the stem, and scraping along the side to the wheel house. The Fletcher was about 40 feet away when first seen, and her course made with the keel of the West Brooklyn something less than a right angle. The responsible persons of the West Brooklyn got no whistles or alarms from the Fletcher. When the Fletcher came in sight, the West Brooklyn was started astern, and was backed until the time of the collision, but did not get under much sternway, and may have been going ahead a little under the headway acquired before she stopped. The West Brooklyn had not reached the position off Castle William where she would turn to go easterly to pier 2 in the East river, which was her destination. Smedley, the deck hand, was on lookout for the West Brooklyn, and appeared reasonably honest, but did not impress the court as being as good a man for a lookout as Johnson of the Fletcher. Lundequist, the engineer of the West Brooklyn, swore to slowing down and stopping, and a bell to go back, and that he continued to go back until his wheel was stopped by the collision. McKittrick, the fireman, testified that he heard the one bell to slow down, and afterwards the two bells to stop, and that through the port hole he saw the Fletcher coming rapidly; but, as he was looking through the port hole, his evidence in this regard is not very useful. He also testified to the two bells to go back. Ambrose, the superintendent of the ferry, testified to the broken woodwork on the West Brooklyn, from a point about 45 feet aft of the stem to the wheel, which was about 70 feet from the stem. He stated that a number of arms and buckets were broken, and that the wheel was jammed on top in such a manner as to indicate that it was in backward motion at the time of the collision. One Crowley, who was a cable operator, accustomed to use that ferry route to reach his business, stated that the accident happened about 5 minutes of 8 o'clock, in which he is confirmed by members of the crew of the West Brooklyn. He states that some time before the accident the West Brooklyn slowed up on account of the thickening fog, and that he heard the bell on Governor's Island; that he changed his position for the purpose of looking out towards it, and that he suddenly saw the Fletcher coming from a point off the island, but on the starboard side of the West Brooklyn. He stated that she was coming fast, navigating towards the West Brooklyn; that there was no signal from the Fletcher; that the West Brooklyn had been blowing from the time of starting, and at a later period very often. He did not know about the West Brooklyn's speed at the time of collision.

It appears from this evidence that each boat claims to have been stopped in the water, with machinery reversed, for the purpose of going astern, and with little, if any, forward motion due to the momentum already acquired; that usual fog signals had been given, but that no signals of any nature were recognized as coming from the opposite boat, except as the Fletcher heard the one whistle from the

West Brooklyn, to which she responded. It is suggested that the lookout of the West Brooklyn could not have been as careful or efficient as that of the Fletcher, because the lookout on the Fletcher says he did hear one signal from the West Brooklyn, while the pilot of the West Brooklyn states that he heard no signal or whistle from the Fletcher. However, it may be that the whistle heard by the lookout and pilot of the West Brooklyn, which they stated sounded off their port bow, may have been the whistle which the Fletcher claims that she gave. But if each of these vessels was blowing fog whistles, as claimed by them (and it is inconceivable that they should have been navigating in the fog without them), it is very strange that, approximating the time of the accident, no more than one whistle should have been heard on either boat, save as the captain of the West Brooklyn claims that he heard two whistles from some vessel. If the rule is to be adopted that the evidence of what happens on a boat is preferable to the negative evidence of the witnesses on the opposite boat that such event did not happen, then it must be concluded that each vessel blew fog whistles with reasonable frequency, and that the duty was fully performed in that regard. There seems to be no proof of superior alertness on the part of the lookout on either vessel. It is true that the Fletcher had two lookouts, where the West Brooklyn had but one. Johnson, on the Fletcher, seemed to be a reasonably good lookout; but the evidence of Tiffany, and his manner of testifying, does not seem to indicate that he added much to Johnson's efficiency. If everything was done as each boat claims, and if each boat is to be regarded as being on its proper course to reach its proper destination, then the case would seem to fall within the decision of The St. Louis, recently made by the circuit court of appeals of this district (39 C. C. A. 261, 98 Fed. 750). No vessel can be adjudged liable unless there is a preponderance of evidence establishing her negligence, and the court is not convinced that either vessel committed any of the faults charged against her. If the West Brooklyn was moving through the water negligently at the time of the accident, why did not Mr. Barrie, who stated that he was in charge of his party, and was acting as lookout, discover the forward motion of that vessel? The evidence of Mr. Barrie and Lord Beresford corroborates the evidence of the crew of the Fletcher that she was not moving forward when the accident occurred. Their evidence, in connection with other evidence adduced by the Fletcher, shows that she was giving proper fog signals, although the master of the Fletcher greatly impaired the case of his vessel by his excessive statements on this subject. It is difficult to disbelieve the concurring evidence of the several witnesses of the West Brooklyn that she frequently sounded her whistle. It is urged that the West Brooklyn should have stopped when she first heard the first signal, rather than at the time of its repetition; but it is enough that she was proceeding very slowly and cautiously at the time the accident happened, and it is not understood to be the rule that a vessel must stop in a fog, and remain silent in the water, at the very instant she hears a fog signal from another vessel. After a careful consideration of the evidence and arguments, the court is inclined to

adopt the conclusion of Lord Beresford that it was "an ordinary accident that would happen and be very liable to happen in any fog, no matter how careful any captain may be or both captains may be." The libel and the cross libel should be dismissed, with costs to each party against the other.