THE EL MONTE.

THE RAPPAHANNOCK.

(District Court, S. D. New York. March 4, 1902.)

1. COLLISION—NAVIGATION IN FOG—CONSTRUCTION OF RULES.

Under the second clause of article 16 of the international navigation rules, which requires a steam vessel, "hearing apparently forward of her beam the fog signal of a vessel the position of which is not ascertained," to stop her engines, and then navigate with caution until danger of collision is over, it is the duty of a vessel to stop under such circumstances, in all doubtful cases, until both the position and course of the other is known.[1]

2. SAME—STEAM VESSELS CROSSING—EXCESSIVE SPEED AND FAILURE TO STOP IN FOG.

In a suit for collision between two ocean steamships in a dense fog, while on crossing courses, it appeared that after entering the fog both continued at more than half speed, in violation of the first provision of rule 16, and that, after hearing each other's fog signals, both proceeded without stopping for some time, in violation of the second clause of such rule; the vessels when they saw each other being within 500 feet, and unable to check their momentum in time to avoid collision. *Held*, that both must be held in fault, and the damages divided.

In Admiralty. Suit for collision.

Convers & Kirlin, for the Rappahannock.

Maxwell Evarts, for the El Monte.

ADAMS, District Judge. These actions arose out of a collision between the steamship Rappahannock and the steamship El Monte, which occurred in a dense fog in the early morning of the 5th day of October, 1900, about 50 miles in a northeasterly direction from Cape Charles. The Rappahannock was bound into Newport News from Liverpool. She was practically in ballast, having very little cargo on board. The El Monte was proceeding up the coast, fully laden with general cargo, on a voyage from New Orleans to New York.

The contentions of the respective parties as to the main facts are as follows:

On the part of the Rappahannock, that in the early morning of the day in question the weather was fine, but became foggy about 6:30 a. m. The chief officer was in charge of the navigation of the Rappahannock at the time. He at once put the telegraph to the engine room at "stand by," to give the engineer on watch notice to be ready for maneuvers. This order was received and noted by the second engineer, who was on duty below. The captain had noticed that it was coming in thick, and was dressing when the chief officer called him, at this time, to tell him the state of the weather, and he came out on the bridge in less than a minute afterwards. At 6:40 a. m. the weather became thicker, and the telegraph was put to "half speed," which order was immediately executed. Meanwhile, from the time the weather first began to get thick, the fog

[1] Collision rules. see notes to The Niagara, 28 C. C. A. 532; The Mount Hope, 29 C. C. A. 368.

whistle had been continually sounded at intervals of about a minute, and the speed of the steamer had been reduced to about 6 knots, when at 7:10 a. m. one single long blast, the ordinary fog signal, was heard by her watch. It came from broad off the port bow, and was judged to be about four or five points before the beam. This afterwards turned out to be a signal from the El Monte. The chief officer looked at the clock at that moment, and noticed that it was 7:10. Instantly the engine room telegraph was rung to slow, and a prolonged single blast was given on the whistle. Both acts were done by the chief officer, and just as he finished blowing the whistle the master, before any further signals were heard from the El Monte, rung the telegraph to stop. Very shortly thereafter, a two-whistle signal was heard from the El Monte. The Rappahannock continued to blow single blasts at about 45 seconds intervals up to the collision, blowing four in all from the time of first hearing the El Monte. Three sets of two-whistle signals were heard from the El Monte after the first fog whistle was heard from her and before the collision. These signals seemed to be coming more abeam all the time. As the El Monte swung into sight, she was bearing about a point before the beam, and her masts were slightly open to starboard, so that her starboard side could be made out. She was coming in at about a right angle, heading forward of the bridge, and turning her bow towards the Rappahannock's stern, as though under a port helm, and apparently trying to clear the latter. Her distance from the Rappahannock, when first sighted, was probably not over 1½ ship's length. Upon seeing her, the order "full speed ahead" was immediately given, and the helm put hard aport to throw her bow around to starboard, as it seemed that the El Monte would strike forward of the beam. But it was immediately seen from the way the El Monte was swinging that she would strike abaft the beam, so that, before the Rappahannock felt the influence of her port helm, the helm was put hard to starboard to throw her quarter off, and give the El Monte a better chance of clearing. As the Rappahannock was practically stopped when the full speed ahead order was given, there was not sufficient time for her to gain headway to escape the blow from the El Monte, although perhaps a half a minute elapsed between the order and the collision. At the time of the collision, the Rappahannock's heading was W. S. W. She had changed a point and a half to starboard from her previous course, S. W. half W., after hearing the El Monte. This was chiefly due to the influence of the right-hand propeller, which tended to make the ship swing to starboard while the engines were stopped. The engines were stopped the second time immediately after the collision. The engine room record shows that the order "slow" was received at 7:10 a. m., the order "stop" at 7:11, the order "full speed ahead" at 7:12, and the final order "stop" at 7:13. Fractional portions of the minutes were not taken into account in marking down the time of the orders,—the minute to which the hand of the clock appeared to be nearest, being put down, so that, if an order came 20 seconds before the minute, it would be put down as of the minute, and if it came 20 seconds after the minute it would also be put down as of

the same 'minute. The engine room and deck clocks were in accord.

On the part of the El Monte, that at about 4:20 a. m., while off the Virginia Capes, the ship ran into a heavy fog. Her engines were put at slow, and the fog whistle was blown every two minutes. The ship was in charge of the captain and first officer in the pilot house. The quartermaster was at the wheel and a man on lookout. The El Monte proceeded under this speed, blowing her fog whistle, according to the regulations, every two minutes, until about 6:10, when the fog lifted in the immediate vicinity of the steamship. The engines were then put at full speed until the fog again thickened, at about 6:40, when a slow bell was given, and the speed of the ship reduced to half speed, which was somewhere between six and seven knots an hour. About 10 minutes after that, according to the ship's log, at 6:50 a. m., a whistle was heard on the starboard bow from the vessel, which afterwards turned out to be the Rappahannock. This whistle was a considerable distance away, and seemed to be a point or two forward of the starboard beam. The El Monte, which was on a course N. 10½ deg. E., at once blew a fog signal in reply. The next signal from the Rappahannock was two short, sharp blasts, which were answered by two short, sharp blasts from the El Monte, and the El Monte's helm was put to starboard. The Rappahannock then replied with one sharp blast, crossing the signal theretofore given. The El Monte at once stopped her engines, and blew two prolonged blasts, with a second interval between to indicate to the Rappahannock, that she had stopped. The order to stop her engines was given at 6:56. A minute or so after, the Rappahannock was seen from the El Monte's deck on the starboard bow, heading directly across the course of the El Monte. An order was given to reverse the engines at full speed at 6:57, and about two minutes after that the collision took place. The Rappahannock had ported her helm for the purpose of enabling her bow to clear the El Monte, and by such maneuver threw her stern on the El Monte's bow. The El Monte's stem came in contact with the Rappahannock's port quarter, near the stern.

The vessels charge each other, inter alia, with fault in not proceeding at a moderate speed in fog, and in not stopping at once upon hearing the first signal. In these particulars, the situation is governed by the sixteenth international rule, providing as follows,— the new part of the rule, which went into effect July 1, 1897, being in italics:

"Art. 16. Every *vessel* shall, in a fog, mist, falling snow, *heavy rainstorms*, go at a moderate speed, *having careful regard to the existing circumstances and conditions.*

"*A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over.*"

The clocks of the vessels did not agree, those of the Rappahannock being from 12 to 15 minutes faster than the El Monte's.

The testimony shows that the Rappahannock's normal full speed was 10 or 11 knots an hour, under about 67 revolutions per minute

of her engine. · She had been proceeding at this speed up to 6:30 a. m., according to her time, when it became somewhat foggy. The steamer was not slowed at this time. Ten minutes later, at 6:40, the fog became thicker, and speed was reduced from 67 to 40 or 45 revolutions per minute, by which, the Rappahannock contended, the speed was reduced to about six knots. This speed was continued in a thick fog until 7:10 a. m., when the El Monte's first signal was heard broad off the port bow. The signal was then rung to slow, which speed was continued until the master came out of his room shortly after, and assumed direct command, when a signal was given at 7:11 to stop. The collision occurred between 7:12 and 7:13.

The El Monte's testimony shows that her normal full speed was from 12 to 12½ knots an hour, under about 65 revolutions per minute of her engine. Entries in her log show that she slowed down at 6:40, according to her time, because it set in thick, and stopped at 6:56. Testimony from her officers is to the effect that she first heard the Rappahannock's signals at 6:50. (The master at one place apparently says 6:10, but that is probably a typographical error for 6:50.) The slowing down was from 65 revolutions to about 50, under which she claimed a speed of about six or seven knots. The collision occurred at 6:59 a. m.

Thus, according to her own account, each vessel continued at a speed of more than half her usual full speed up to within two or three minutes of the collision, in a frequented part of the ocean, and in a fog of such density that they could not discern each other until they were within a distance of about 500 feet. This was a violation of the first paragraph of the sixteenth rule (The Niagara, 28 C. C. A. 528, 84 Fed. 902; The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637); but it is possible that a collision might then have been avoided had not the second paragraph been also clearly violated in the failure to stop the engines and navigate with caution until danger of collision was over. The Rappahannock seeks to avoid the effect of the rule by asserting that she did practically stop at the moment of hearing the El Monte's first signal, as the slowing and stopping were almost simultaneous, the records of the movements of the engine not showing fractional parts of a minute, and the orders instead of being a minute apart might have been only twenty seconds, as twenty seconds either way would, by the record, be included in the minute mark. I do not see, however, why there might not have been, upon the same theory, an interval of a minute and forty seconds between the orders, and the presumption here would be, in the absence of contrary proof, in view of the violation of a statutory duty, rather in favor of a lapse of the greater time. She has certainly not relieved herself of the statutory burden. The El Monte, in effect, concedes the proper application of the rule to her navigation, unless it appears to be inapplicable because the position of the Rappahannock was ascertained by means of the signals exchanged. That is, having received, as a second signal, a two-whistle signal from the Rappahannock from some distance away, she was justified in concluding that the Rappahannock was proceeding down the coast on a course that would carry the vessels safely past each

other starboard to starboard, and that, therefore, no necessity existed for stopping. An ingenious argument, is advanced in support of this theory to the effect that, when a fog signal is clearly on the starboard or on the port bow, the position of the vessel whose signal is heard is ascertained so far as the position of a vessel in a fog can ever be ascertained, and is ascertained within the meaning of the words in the sixteenth article, and under such circumstances it was never intended that the vessel hearing the fog signal should stop her engines and remain stationary, thus stopping navigation in fogs. The difficulty with the contention is that the El Monte did not hear such a signal, because none such was given, but, assuming that she was justified in believing that there was a signal of the kind, she was not at liberty to conclude that the vessel was on a course to pass her in safety, or that the signal was given as a course signal to her. The object of this section of the article, providing an additional precaution against collision, was obviously to prevent vessels from approaching each other closely in a fog,—not, perhaps, requiring vessels to stop when so far away from each other that no danger actually existed, or could exist, until the situation changed, but in all doubtful cases requiring an immediate stoppage of the vessel for the purpose of a better hearing, to get the vessel's headway fully under command, and to cause all on board to be on the alert to provide for contingencies. An instructive discussion of the reasons for this amendment occurred when it was being considered in the International Maritime Conference of 1889, showing that the duty of stopping should be made imperative in order to avoid the danger of leaving too much to the navigator's judgment. Protocol of Proceedings, vol. 1, pp. 453–461. I consider this case directly within the spirit and letter of the rule. Here was a vessel, going ahead in a dense fog at the rate of at least six knots, receiving the signal of another, whose position and course were only conjectural, and yet kept on, with the result of bringing the vessels together, when an observance of the rule would undoubtedly have avoided danger. The violation cannot be overlooked. The St. Louis, 39 C. C. A. 201, 98 Fed. 750; The Rondane, 9 Mart. Law Cas. 106. As I conclude that both vessels were in fault under the sixteenth article, it is not necessary to discuss the other questions.

A decree will be entered dividing the damages.