UNITED NEW YORK SANDY HOOK PILOTS ASS'N et al. v. DEN NORSKE AMERIKALINJE A/S.

Nos. 295, 296.

Circuit Court of Appeals, Second Circuit.

June 19, 1941.

mistake as to the Oslofjord's whistle. This led her to suppose that the Oslofjord had stopped and was waiting for her to come near and put a pilot on board; it also led her to get under way on a S. S. E. course which took her south and east of the lightship. While this navigation was not indeed a fault, nevertheless it must be judged as though she had known the facts. These were that the Oslofjord was feeling her way up to the lightship, expecting to meet the pilot boat there, as was by far the most common, though not the absolutely universal, practice. Furthermore, the Sandy Hook was also charged with notice of the probable course of the Oslofjord, which she knew to be coming in from the east and at some time to be sure to round the lightship under a right rudder and to head up into Ambrose Channel, even though she did not know, as she could not, how close the Oslofjord would come to the lightship in so doing. Hearing the steamer upon her port bow the Sandy Hook was therefore charged with notice that they must be approaching on crossing courses, and, even though she may have correctly "ascertained" the steamer's position at the moment when she heard the whistle whose significance she mistook, she did not, and could not thereafter "navigate with caution," just because she had mistaken that significance. Had that been understood, it would have been wholly unjustified to keep on across the steamer's path as in fact she did.

Indeed, the gravamen of the appeal is the Oslofjord's fault. We are in no better position to judge of her actual speed than the judge; nor indeed in as good, for he saw all the witnesses. The doctrine which we have so often announced, that we will not disturb the findings of the trial court, is particularly appropriate in fog cases, where it is so seldom possible to come to any certain conclusions as to the speed and position of the vessels. The judge accepted the testimony of the Oslofjord's witnesses and we should certainly be unwarranted in saying that it was "clearly erroneous" to find them as convincing as he did; against witnesses of intelligence, competence and candor it is seldom desirable to match the opinions of those who, though not on the scene, venture such quantitative estimates as how much of her way a vessel must have kept after her engines have been stopped for a given period. Indeed, we rely upon such opin-

William H. McGrann, Kirlin, Campbell, Hickox, Keating & McGrann, E. F. Gilligan, and H. B. Finn, all of New York City, for appellants.

John W. Griffin, Haight, Griffin, Deming & Gardner, and W. Parker Sedgwick, all of New York City, for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

PER CURIAM.

It is plain that this collision would not have happened except for the Sandy Hook's

ions only when direct evidence is lacking or unreliable. However, it is another matter whether on the facts as the judge found them, the Oslofjord may not have been at fault. The Sandy Hook insists *that she violated both commands of Arti*cle 16 of the International Rules, 33 U.S.C. A. § 92.

█ The first alleged fault is that the Oslofjord did not stop her engines upon hearing the Sandy Hook's whistle forward of her beam, while the Sandy Hook was still standing by the lightship. The Oslofjord first heard the whistle at some undefined time before 6 A. M. and it is true that she did not stop her engines until 6:10, and then did so to keep out of the way of a tug and tow on her port hand. Furthermore, from 6:02 to 6:10, the fog having lifted a little for the time being, she had increased her speed to eight or nine knots. It took her nine minutes safely to clear the tug and tow, during which she continued to run off any speed thus acquired, and at 6:19 she started up again at "dead slow" and so continued for three minutes. At 6:22, her engines were again stopped and remained so until the collision, a minute later, at which time she was moving at about two or two and a half knots. Throughout all this period she was hearing the Sandy Hook's whistle regularly and the argument is that if she had stopped in the first place, and not started again until the Sandy Hook's position had been "ascertained" there would have been no collision, or at least that it has not been shown beyond reasonable doubt that there would not have been. We cannot agree. When the Oslofjord first heard the signal she at once assumed, and correctly assumed, that she had "ascertained" the Sandy Hook's position; for that vessel was then close to the lightship, indeed the Sandy Hook put a pilot aboard the Monarch of Bermuda after that time. The rule imposes no duty of stopping the engines, unless the signal be from "a vessel the position of which is not ascertained." If the Oslofjord was at fault in this respect, it can therefore have been only after the Sandy Hook changed her first "position" by leaving the neighborhood of the lightship. But the rule does not impose a succession of duties upon a vessel to stop her engines, once she has correctly "ascertained" the other vessel's "position"; she must obviously go ahead, else, since the duties are reciprocal, the two would never pass. All ' that is demanded of each after the other vessel's position is once "ascertained" is that she shall "navigate with caution until danger of collision is over." That is precisely what the Oslofjord did, for in appraising her "caution" we are always to remember that she was warranted in assuming that the Sandy Hook would wait for her at the lightship, as the Sandy Hook would in fact have done had she not misread the whistle.

█ Therefore, if any part of the rule was applicable, it is the first sentence. Was the Oslofjord's speed "moderate" from 6:19 when she started at "dead slow" to 6:22 when she stopped, hearing the Sandy Hook's whistle getting further aft than she had expected? The "moderateness" of speed is to be judged "having careful regard to the existing circumstances and conditions." In the case at bar those were—judged from the deck of the Oslofjord—that when she got near the lightship the Sandy Hook would approach, round to and stop close enough to put the pilot on board. Until she came near the lightship, a speed of three and a half to four knots was not too high for that manoeuvre, even if it might have been as to a boat *whose presence or position was not* known. The Sandy Hook may not vicariously invoke the gloss upon the rule that the speed must be no greater than can be overcome within the existing visibility; that may be inexorable as to unknown vessels, but the Sandy Hook was not in the class which it is designed to protect. In navigating in relation to a vessel to which one is to draw near, and whose movements one knows or is entitled to forecast, those are part of the "circumstances and conditions" which must govern the speed. It was only when Bull, the Oslofjord's master, began to have reason to doubt whether the Sandy Hook was following the usual course that he was in duty bound to reduce his speed and then he did, and this is true, even though three and a half or four knots had been too high before, qua another vessel; which we do not say that it was, given the unusual backing power at his disposal.

Decree affirmed.