STANDARD OIL CO. OF NEW JERSEY
v.
BLACK DIAMOND S. S. CORP.

BLACK DIAMOND S. S. CORP.
v.
THE ESSO EVERETT et al.

THE GAINESVILLE VICTORY.

Nos. 19246, 19336.

United States District Court
E. D. New York.

June 3, 1954.

Kirlin, Campbell & Keating, New York City, for libelant and cross-respondent. Ira A. Campbell, John F. Gerity, New York City, of counsel.

Hunt, Hill & Betts, New York City, for respondent and cross-libelant. John W. Crandall, Robert M. Donohue, New York City, of counsel.

BRUCHHAUSEN, District Judge.

The Standard Oil Company, as owner of the vessel, Esso Everett, and as bailee of her cargo, brought this suit in admiralty against the respondent, Black

**394**

Diamond Steamship Company, as charterer of the vessel, Gainesville Victory, to recover damages for a collision, occurring in a thick fog on April 16, 1948, at about 10:45 P.M., while both vessels were navigating easterly of Block Island, Rhode Island. The said owner of The Gainesville Victory filed a cross libel against the said Esso Everett and its owner for the damages it claims to have sustained in the collision. Both libels were consolidated. Practically all of the evidence, other than the Exhibits, was presented by deposition.

The Gainesville Victory is a dry cargo steamer about 455 feet in length and of 7,612 gross tons register, with a beam of about 62 feet, powered by a steam-turbine engine of 8,500 horse-power, driving a single-screw right-handed propeller, pitched to 22.9 feet, drawing 15 feet 6 inches of water. She was bound from Boston to Philadelphia with a small amount of cargo, proceeded through the Cape Cod Canal, passed Hen & Chickens Light Vessel and pointed a course 227 degrees true toward Block Island southeast Lighted Whistle Buoy.

The Esso Everett is a bulk oil tanker, powered by a steam turbo electric engine, driving a single right-handed propeller, pitched to 17.5 feet. She is 504 feet in length and of 10,448 gross tons register and had a draft of 29 feet, 11 inches. She was laden with a cargo of bunker fuel oil and was bound from Beaumont, Texas, to Providence, Rhode Island.

The Esso Everett approached Block Island on a northerly course. At about 9:45 P.M., intermittent light fog shut in and her speed was reduced to half ahead, between 7 and 8 knots. Fog signals were sounded at regular intervals. At about 10 P.M. her speed was reduced to slow ahead, about 4½ knots. At about 10:05 P.M. the fog cleared and her speed was increased to half ahead. Then, at about 10:15 P.M., fog again shut in and speed was reduced to slow ahead and fog signals resumed. She set a course of 30 degrees true to clear the shoals off Block Island. At about 10:40 P.M. a fog signal of another vessel was

heard, later determined to be The Gainesville Victory, bearing 40° to 45° on the starboard bow of The Esso Everett. The fog blasts were answered by The Esso Everett. A check of the signals from The Gainesville Victory were heard to be drawing aft, indicating the vessels would clear. The master of The Esso Everett concluded that The Gainesville Victory was probably proceeding toward the sea and that such a course would permit a safe passing of the steamers starboard to starboard. Consequently, The Esso Everett held her course. At about 10:44 P.M. the glow of the lights of The Gainesville Victory was observed at a distance of about 1500 feet from The Esso Everett and the latter stopped her engine. When The Gainesville Victory was about 1,000 feet away, The Esso Everett reversed her quick acting engine to full speed astern and put her rudder hard right to swing away from The Gainesville Victory. The Gainesville Victory was bearing about 70 degrees on The Esso Everett's starboard. She continued her headway, and, under hard right rudder, headed at a 90° angle into the starboard side of The Esso Everett.

There are inconsistencies in the testimony of the personnel of The Gainesville Victory as to the operations of that vessel just prior to the collision, accounted for by the fact that the Captain was engaged in answering the telephone, operating the engine telegraph, reading the wheelhouse clock, recording some events, giving orders to the wheelsman, sounding fog signals and conducting conversations with the pilot and watch officer, both stationed outside the wheelhouse, also in that, after the collision, he directed the recording of entries in the deck log on which his crew based their evidence. The credible evidence is that at 9:14 P.M. The Gainesville Victory reached a point one mile southeast of Hen & Chickens Light Vessel, marking the westerly end of Buzzards Bay; that at that point her course was 227 degrees true and her speed 18½ to 19 knots; that she continued that course and speed

until 10:16 P.M. when fog set in and her speed was reduced to about 13 knots; that at 10:18 P.M. heavy fog set in; that at 10:21 P.M. she reduced to half speed ahead, a speed of 8½ to 9 knots; that at 10:29 P.M. the first fog signal was heard from the vessel later determined to be The Esso Everett; that The Gainesville Victory reduced her speed to 4½ knots; that at 10:30 P.M. the master and pilot of The Gainesville Victory, judging that the other vessel, The Esso Everett, was on a reciprocal course, rather than on a crossing course bound for Providence, altered the course of The Gainesville Victory 10° to the right to a heading of 237° true; that at 10:32 P.M., The Gainesville Victory again altered her course 10° to the right; that at 10:35 P.M. the course was further altered 10° to the right, all of which changes of courses resulted in a course for The Gainesville Victory of 257° true, as compared with the course of 227° true, adopted when the vessel departed from the vicinity of Hen & Chickens Light Vessel. Even though The Gainesville Victory reversed her engine to full speed astern, she was unable to stem her headway.

It is claimed on behalf of The Esso Everett that if The Gainesville Victory had maintained her original course, the vessels would have passed each other safely. The contention is correct and fully supported by the evidence. It is the unwarranted departures therefrom by The Gainesville Victory which caused the collision.

The contentions for The Gainesville Victory that she had little or no headway at the time of the collision and that The Esso Everett had considerable headway are refuted by the photographs (G.V. Exh. 5–10) and other Exhibits. The depth of penetration into The Esso Everett's starboard side was about 11 feet, several tanks were pierced and part of the oil cargo was lost. Not only did The Gainesville Victory change her course at different intervals without reason after hearing The Esso Everett's fog signals, but she still had considerable

headway at the time of collision, possibly due to her failure to stop upon hearing the fog signals of The Esso Everett.

The libelant, Standard Oil Company, contends that The Gainesville Victory was at fault in failing to stop her engines when the first fog signal from The Esso Everett was heard by the lookout and reported to the master at 10:29 A.M. The watch officer, Albert Fabian, testified at the Coast Guard examination, shortly after the collision and again, several months later, by deposition for this trial. There are variances in his statements, made on each of those occasions. At the earlier hearing he stated that the first whistle he heard was at 10:30 P.M. and the engine was then stopped; that there was an earlier whistle reported by the lookout about a minute before 10:30 P.M. The pilot of The Gainesville Victory, Sherman F. Ing, by deposition testified that the lookout reported by telephone to the bridge that he had heard a whistle ahead; that the engines were put on slow speed at 10:29 P.M. one minute before "we" heard the whistle; that "we" heard the whistle at 10:30 P.M. The Gainesville Victory should have stopped her engine when the whistle was reported by the lookout at 10:29 P.M. and should not have waited until a later whistle signal was heard by those on the bridge. Cf. The Longview Victory, 2 Cir., 196 F.2d 689, 691. The second paragraph of Article 16 of the International Rules, 33 U.S.C.A. § 92 and the Inland Rules, 33 U.S.C.A. § 192, provide in substance that a vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall stop her engines and navigate with caution. In the case of Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 296, 37 S.Ct. 270, 61 L.Ed. 726, this was held to be a mandatory requirement. This fault of The Gainesville Victory was a contributing cause of the collision along with her unwarranted course changes.

The libelant, Standard Oil Company, also claims an additional violation of Article 16, contending that, after hearing

the fog signal of The Esso Everett, The Gainesville Victory failed to navigate with caution until danger of collision was over. As already stated, the master and pilot of The Gainesville Victory labored under the mistaken assumption that The Esso Everett was on a reciprocal course bound for Hen & Chickens Light Vessel, whereas The Esso Everett in fact was on a crossing course bound for Providence. The pilot admitted that Providence is a large port, navigated into and out of by large ocean-going tankers. The Gainesville Victory at 10:30 P.M., at 10:32 P.M. and at 10:40 P.M. altered her course 10° each time to starboard, a total of 30° within that elapsed period of time of ten minutes. By so doing, The Gainesville Victory changed her position of safety to one of danger and pointed directly towards the path of The Esso Everett. The evidence fails to justify the change in course. The direction from which the fog signals of The Esso Everett came was important in estimating her location and heading. During the said period of time when The Gainesville Victory altered her course, The Gainesville's change of compass course was 30°, the change in relative bearings (angle on bow) of Esso Everett's whistle was 30° and the change in compass bearings of The Esso Everett's whistle was 4°. The true or compass bearing remained substantially constant. The rules set forth that if the compass bearing does not appreciably change, the risk of collision is deemed to exist. 33 U.S.C.A. §§ 101, 201. It is important to note that the master of The Gainesville Victory made two of the alterations of course to starboard despite the fact that following the first change of 10° at 10:32 P.M., he realized that The Esso Everett was on a crossing course and not on a reciprocal course, as he had originally concluded. In his deposition he, in part, said: "but when his position stayed at an angle there, after that first course change, that indicated to me that he (The Esso Everett) was absolutely in the case of a vessel crossing from port to starboard." Under these circumstances, The Gainesville Victory was not warranted in changing her course and thereby creating a dangerous situation. The Sandy Hook (The Oslofjord), D.C., 35 F.Supp. 150, United New York Sandy Hook Pilots Ass'n v. Den Norske Amerikalinje, 2 Cir., 121 F.2d 304, certiorari denied 314 U.S. 684, 62 S.Ct. 188, 86 L.Ed. 547.

The said libelant further charges that when the vessels came into visual sight of each other, The Gainesville Victory was proceeding at an immoderate speed, in violation of Article 16. The provision in Article 16, so alluded to provides that in a fog, every vessel shall "go at a moderate speed, having careful regard to the existing circumstances and conditions." See The Nacoochee, 137 U.S. 330, 339, 11 S.Ct. 122, 34 L.Ed. 687; The Umbria, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053; and The Tuxedo, 2 Cir., 77 F.2d 354, 355. In the latter case, the Court wrote:

> "What is moderate speed under such circumstances is a rate of speed not in excess of that which will permit a vessel to stop within the distance she can see another vessel with which she may be in danger of collision."

The evidence is that The Gainesville Victory had full range of visibility ahead of her of at least 500 feet and was then headed for the starboard side of The Esso Everett. Apparently, unable to stop, even by reversing her engine, she ran into the starboard side of The Esso Everett and gouged a hole in it 11 feet deep. She was not within the proper control prescribed by the rule at and immediately prior to the collision.

It is undisputed that when The Gainesville Victory sighted The Esso Everett, she was heading for the starboard side of The Esso Everett and that the hard right rudder maneuver of The Gainesville Victory swung the latter vessel to starboard. Under the circumstances this assured a collision. Unquestionably, the order of The Gainesville Victory should have been to steer to port, not starboard. Under similar circumstances, it was held in the case of The Chagres,

D.C., 80 F.Supp. 308, 324, that such a turn to starboard was a turn into danger, citing Cuba Distilling Co. v. Grace Line, Inc., 2 Cir., 143 F.2d 499, certiorari denied 323 U.S. 782, 65 S.Ct. 271, 89 L.Ed. 624. In the latter case, the Court, quoting from another case, wrote:

> " 'Even in extremis * * * some discretion is demanded; the phrase means no more than that less judgment is required in an emergency than when there is time to consider; it does not exculpate all faults; it is no more than a palliative.' "

■ The prior faults of The Gainesville Victory, hereinbefore set forth, do not exculpate her from this failure on the ground of "in extremis". This was no sudden emergency, but rather the result of a course of conduct over a period of time which afforded ample opportunity for the exercise of considered judgment. See National Bulk Carriers v. United States, 2 Cir., 183 F.2d 405, 408, certiorari denied 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631. In this connection, the Court in The Chagres case, wrote 80 F.Supp. at page 324 (citing cases):

> "The doctrine of in extremis does not operate upon acts done by a master suddenly and abruptly faced with peril or the danger of collision, where his prior fault contributed to the risk or danger of collision."

■ We now consider the alleged fault of The Esso Everett. She is charged with violation of Article 16 in failing to stop her engine when the first fog signal was heard by her at 10:40 P.M. The Esso Everett concedes this fault and her heavy burden of proof to overcome it. Under these circumstances, she must establish that her fault not only did not, but could not have contributed to the collision. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148; Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726. As previously stated The Esso Everett kept at slow speed and did not stop her engine until 10:44 P.M., when The Gainesville Victory became visible at 1,500 feet. The Esso Everett reversed her engine at 1,000 feet and put her rudder at hard right.

The Gainesville Victory claims that by not stopping her engines, The Esso Everett, which was then proceeding at 5 knots, went ahead approximately 2,000 feet in the water, thus bringing her to the point of collision, whereas if she had stopped she would not have reached that point and avoided impact.

The Esso Everett contends that none of The Gainesville Victory's faults, hereinabove enumerated, were influenced by the failure of Esso Everett to stop her engine and that if The Esso Everett had stopped her engine, it would not have changed the situation. It is argued that The Gainesville Victory progressively broadened the bearing of The Esso Everett's whistle signals by her changes in course, and that The Gainesville Victory's final course of 257° would have probably led toward The Esso Everett in any event. It is further alleged that such stoppage would merely have made the angle of conversion 47° instead of 90°; that had The Gainesville Victory at the outset altered her course to her starboard under hard right and continued that alteration of course in a continuous arc across the bow of The Esso Everett and up to the point of collision, The Esso Everett could not sustain her burden by establishing that her fault was non-contributory, because if she (The Esso Everett) had stopped sooner than she did, The Gainesville Victory would have crossed ahead of her.

There is no doubt that when a statutory fault has been committed such as was done by The Esso Everett by the failure to stop upon hearing the fog signals of The Gainesville Victory, she must bear the heavy burden of proving that her fault not only did not, but could not, have contributed to the accident. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148.

■ It is well recognized that when a fault is shown to be a condition or circumstance of a collision rather than a

cause of the collision, the vessel at fault will be exonerated. See the explanation in The Choctaw, 2 Cir., 129 F.2d 618, 621.

█ It may be seen from the cases cited in The Choctaw, supra, 129 F.2d at page 621, that they are the types wherein the statutory fault is demonstrably disassociated from the chain of events effectively entering into the causal links leading up to the accident. They may be compared to props upon a stage never used by the actors, and never having a causal effect either upon the players or upon the scene as viewed by the audience. They are, rather, mere incidents of the occurrence whose effects are nil or clearly inconsequential.

To establish the position that her failure to stop was a mere condition and circumstance, rather than a cause of the accident, and could not have caused the collision, The Esso Everett must necessarily enter the realm of conjecture. She alleges that The Gainesville Victory would not have altered her navigational pattern, but would only have changed the angle of collision because of The Gainesville Victory's planned maneuvers.

It will be recalled that there was but a four to six minute interval between the time when The Esso Everett should have stopped her engines upon hearing the fog signal of The Gainesville Victory and the point of collision. It was evident to The Esso Everett that a dangerous situation existed with relation to The Gainesville Victory. The situation in that respect is similar to The St. Louis, 2 Cir., 98 F. 750, 752. The very purpose of the statute is the stoppage of engines, ascertainment of relative positions and cautious navigation thereafter. Possibly, The Esso Everett, by stopping her engine would have more clearly ascertained the position of The Gainesville Victory's consistent yet faulty maneuvers. See The St. Louis, supra, 98 F. at page 752. This possibility is far stronger than the problematical hypothesis advanced, viz.: that The Gainesville Victory would merely have hit at a different angle, a contention this Court cannot accept under the facts as sufficient to meet the heavy bur-

den of proof under the rule. Thus, although her speed was greatly decreased by the time she collided with The Gainesville Victory, she was still propelled ahead to a new point by her failure to stop. Thus, her headway may have been stopped at the instant before impact because of the reversal of the quick-acting engines. However, the speed which brought her forward to the point of collision by her failure to stop was not dissipated by the passage of time before collision. In addition, the "factual effects" of the failure to stop were not dissipated to the extent that they could not have caused the collision, viz.: the loss by The Gainesville Victory of the possible avoidance of the accident had The Esso Everett stopped, possibly learning the position of The Gainesville Victory, and then cautiously navigating thereafter. This Court has carefully weighed her contentions which are not without merit. However, in the face of the rule requiring proof that the accident could not have happened, this Court cannot accept the contentions of The Esso Everett.

To hold that where two ships are heading toward collision in a fog due to the greater faults of the first, that the second is not liable for a failure to stop as prescribed by statute for the ascertainment of the second's position and surrounding circumstances and cautious navigation based thereon, which might have avoided the accident in accordance with the statutory purpose, would be to destroy the rule and burden of proof thereto, which this Court should not do. This is not an immaterial fault which may be overlooked. It would be tantamount to saying, "That other fellow doesn't know what he's doing, wherever he is, and I'm holding a true course so I'll keep right on going. Stopping won't be of any use, since I won't learn anything or change my course by so doing." Cf. Southern Transportation Co. v. Dauntless Towing Line, 2 Cir., 140 F.2d 215, 216.

The heavy burden of showing that the failure to stop was a mere condition or circumstance which would only have

changed the angle of collision has not been sustained. The Court believes that the rationale in Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 272, 61 L.Ed. 726, citing The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, is applicable. The Court wrote:

" * * * it is not possible in the administration of practical justice to avoid the conclusion that the effect of the wilful disobedience of this imperative and important statutory rule of law, which should have governed his conduct, continued as an effective force, operating on the movement of his vessel to the instant of collision, driving her forward steadily, even though in the last moments slowly, to the fateful point of intersection of the courses of the two ships."

There is nothing in The Longview Victory, 2 Cir., 196 F.2d 689, 691, which calls for a different holding. The burden required to exculpate The Esso Everett has not been met, and this Court finds that damages should be apportioned.

The attorneys for the parties are to be commended for the excellent presentation of their cases. Submit findings and decree on notice.