## DUNTON v. ALLAN S. S. CO., Limited.

(Circuit Court of Appeals, Third Circuit. January 15, 1903.)

### No. 7.

1. COLLISION—STEAM AND SAILING VESSELS MEETING IN FOG—UNAVOIDABLE ACCIDENT.

A collision occurred at sea during a thick fog, between a schooner and a steamship, which met on nearly parallel courses. On hearing the fog signal of the schooner the steamer, which was then quite close, at once slowed down and proceeded with caution, while the schooner, which was sailing close-hauled on the port tack, with a very light breeze, kept her course and speed. The vessels were both properly manned and equipped, and had proper lookouts. After they sighted each other, when they were about 100 yards apart, the steamer did all that was possible to prevent collision. *Held*, that neither vessel was chargeable with any fault, and that the collision must be attributed to unavoidable accident.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 115 Fed. 250.

Robert H. Smith, for appellant.

Henry R. Edmunds, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. The statement of facts made by appellant, so far as borne out by the record, are as follows:

The collision, out of which this suit grows, was between the foremasted schooner "Lydia M. Deering," of which the appellant was the master, and the British steamship "Siberian," owned by the Allan Steamship Company, Limited, the appellee. It took place about 6:20 p. m. on June 2, 1901, the schooner at the time being bound from the Kennebec river, Me., to Washington, D. C., with a cargo of ice, and the steamship bound from Philadelphia to Glasgow, via St. Johns, Newfoundland, with a general cargo. The place of the collision was about 75 miles east from the Capes of the Delaware. The weather was very foggy at the time and place of the collision, and had been

more or less foggy all the day. The wind was very light from the south southwest. The schooner was carrying all her sails, except the jib topsail; was close-hauled by the wind on the port tack and was making about two knots an hour. The bluff of the steamship's port bow struck the schooner a glancing blow on the port side, near the mizzen rigging, doing considerable damage, but temporary repairs were made by her master and crew, and she proceeded to her destination, where she discharged her cargo, and then was towed to Baltimore and the collision damages repaired.

The witnesses on both sides agree that there was a thick fog at the time of the collision, as well as for some hours previous thereto. They also agree that the wind was light, and barely enough to give steerage way to the schooner. There is some difference in the testimony of those on the schooner and those on the steamship, as to the distance at which an object could be seen through the fog. There is no difference in the testimony as to the direction of the wind, and that the schooner, close-hauled on the port tack, was heading nearly west, and that the steamer bound from Philadelphia to Glasgow, heading somewhere about east by north, was in a course that would cross that of the schooner at about a point or a point and a half.

There is no real conflict in the testimony, but there is an important difference between the testimony of those on the schooner and those on the steamer, as to how long the signals of the other were heard prior to the collision. It is testified in behalf of the schooner, that she was equipped with a patent mechanical fog horn, which was being worked by a man stationed for that purpose, and that a signal of two blasts on this horn was blown at intervals of less than a minute, and had been so blown for several hours before the collision. The man stationed for this purpose did not testify, it being stated by the libelant that he had left the schooner and was sick in a hospital. The testimony of those on the steamer is, that an automatic steam fog whistle was blown at the required intervals of a minute or less during the fog, and up to the time of the collision. In fact, the case of libelant largely rests on the fact, testified to by those on the schooner, that the whistle of the steamer was heard at least 15 minutes before the collision, and on the contention thereupon made, that the fog horn of the schooner could have been heard on the steamer for a much longer interval than was testified to. The testimony of the navigating officers and the engineer of the steamer, on this point, is that some half hour or more before the collision, owing to the fog, a signal was given to the engineer of the steamer for, what is called, "half speed and stand by," and that about 20 minutes before the collision, the signal was given for "slow and stand by." There is no suggestion in the testimony that the steamer was not well officered and manned, or that the officers were negligent or inattentive in navigating the ship. Their testimony is, that some time before the collision, the master and first and second officers were on the bridge; that the first signal, which was one of two blasts, heard from the schooner, was just a few seconds before she loomed in sight through the fog; that immediately upon hearing these whistles, a signal was given to the engineer to stop, and within a few seconds thereafter, when the schooner loomed up, another signal

for "full speed astern" was given, and that almost immediately there-after, the collision occurred. The schooner held her course, in obedi-ence to the ordinary rule in that behalf, but it may well be doubted whether, in such conditions as then prevailed, with the whistle of a steamer sounding from a point to a point and a half on her port bow, she should not have parted her helm and thus steered clear of the course of the oncoming vessel. The libelant contends that the steamer was going at too high a speed, and that the signals from the schooner either were or should have been heard as soon as the steamer's sig-nals were heard on the libelant's vessel. But those on board the steamer must be taken to know what occurred there, in the absence of any direct or collateral impeachment of their testimony. It is to be remembered, too, that the breeze was blowing from the steamer to-wards the schooner, and that the steamer's whistle was probably more powerful than the horn on the schooner.

A careful review of the testimony convinces us that, on both vessels, the requisite care, under the circumstances, was taken to avoid acci-dent, and that the collision was an unavoidable accident, for which no fault should be imputed to either vessel. In this, we agree with the opinion of the learned judge of the court below, when he says:

"The testimony satisfies me that, as soon as the vessels came in sight of each other, everything that was possible was done upon the steamship to avert the threatened disaster. She had already slowed down upon hearing for the first time the fog signal from the schooner, and this, I think, was her full duty. As the supreme court of the United States has said in The Hol-berg, 157 U. S. 68, 15 Sup. Ct. 480, 39 L. Ed. 620: 'No case has ever held that a steamer was obliged to stop at the first signal heard by her, unless its proximity be such as to indicate immediate danger.' Clearly there was no such indication in the present case, and the steamship was not at fault, there-fore, in doing no more than slowing down to a moderate speed, and thereafter proceeding with caution. As soon as the Siberian saw the schooner, she im-mediately had her engines put full speed astern, and put her helm astarboard in the effort to pass in safety. The schooner held her course, and in this I am unable to say that she was in error; for, if it be true, as was testified by some of the witnesses for the steamship, that the schooner's helm was put to port, the result would probably have been what those witnesses say that it actually was, namely: to swing the schooner's stern to port, and thereby bring her more directly across the bow of the approaching steamship. The bluff of the Siberian's port bow struck the schooner's port quarter well aft, and did a good deal of damage. Neither vessel, I think, was moving through the fog at a negligent rate of speed. The schooner's sails were all drawing, but the wind was so light that, as I have already said, she was not moving faster than two knots an hour, which gave her little more than steerage way; and the steamship had slowed her speed at the first intima-tion of danger, and thereafter proceeded with due caution."

And we agree with the court below in thinking that the libel should be dismissed, leaving each party to bear his own costs.

Let a decree be so drawn.