THE GEORGIC et al.

(District Court, S. D. New York. May 31, 1910.)

1. COLLISION (§ 82*)—STEAM VESSELS MEETING IN FOG—SPEED.
   Where a steamship for some 15 minutes prior to collision with a meeting vessel in a fog had been going at slow and dead slow speed, and was barely moving at the time of collision, her prior speed is immaterial.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 170–174; Dec. Dig. § 82.*]

2. COLLISION (§ 84*)—STEAM VESSELS IN FOG—VIOLATION OF RULES.
   Article 16 of the Inland Navigation Rules (30 Stat. 99 [U. S. Comp. St. 1901, p. 2880]), which provides that "a steam vessel hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over," is mandatory, and its violation creates a very strong presumption of fault, and casts upon the offender the burden of showing by clear testimony that his error did not contribute to an ensuing collision.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 168, 176; Dec. Dig. § 84.*
   Collision rules—speed of steamer in fog, see note to The Niagara, 28 C. C. A. 532.]

3. COLLISION (§ 83*)—STEAM VESSELS MEETING IN FOG—MUTUAL FAULT—VIOLATION OF RULES.
   A collision in the Main Ship Channel to New York Bay in a fog between the meeting steamships Georgic and Finance, in which the latter was sunk, held due to the fault of both vessels, each of which heard the fog signals of the other forward of her beam in a position not ascertained, but did not stop as required by article 16 of the Inland Navigation Rules (30 Stat. 99 [U. S. Comp. St. 1901, p. 2880]), but continued ahead until the signals had been repeated three or more times, each time closer, when both were going at moderate speed and a compliance with

---

the rule would have avoided the collision. The Finance *held* also in fault for being on the wrong side of the channel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 156, 167, 175; Dec. Dig. § 83.*]

In Admiralty. Proceeding by the Oceanic Steam Navigation Company as owner of the steamship Georgic for limitation of liability for damages occasioned by collision between that vessel and the steamship Finance. Decree for limitation of liability, and finding both vessels in fault.

Mr. Montgomery and Mr. Kirlin, for the Georgic.

Mr. Rogers and Mr. Burlingham, for the Finance.

Mr. Symmers and Mr. Kneeland, for divers cargo owners and underwriters.

HOUGH, District Judge. From the voluminous testimony in this case a few facts can safely be said to be either admitted or so plainly proven as to require only statement without discussion of the evidence. On the morning of November 26, 1908, there was a collision between the Georgic and the Finance in the Main Ship Channel to the eastward of a north and south line drawn from the Hook Beacon to Buoy N 4 and (having regard to the line of channel buoys) between Buoys N 4 and N 2½. The vessels came together with the bow of the Georgic against the port side of the Finance at a point not more than one-third of the Finance's length forward of her extreme stern. The angle of collision between the port sides of the two steamers was between 3 and 4 points. A more definite statement is not necessary, nor attainable. The moment of contact according to the Georgic's time was between 7:44 and 7:45 a. m.; more than this cannot be positively asserted, but it was probably nearer 7:45 than 7:44. It is not possible to compare the times when similar or related orders were given on the two vessels, because, although the time record on the Georgic is ample, and I think proven to be accurate, the Finance became a total loss, all her records and documents have disappeared and one of her engineers lost his life. All statements of time from the Finance can therefore be nothing more than efforts of memory, and the only thing plain is that her clocks were somewhat faster than those on the Georgic. In the view taken of this cause, however, I do not think that the exact moment of order given or maneuver executed on the Finance is of great importance in reaching decision.

The Georgic is a large and full-powered steamer with twin screws, 558 feet long, was at the time of disaster in proper trim, with an average draft of about 20 feet, and was bound in from Liverpool to this port. The Finance was a much smaller, single screw, boat, 295 feet long, of lighter draft, and bound out from New York to Colon. For some time prior to the early morning of November 26th the weather in the neighborhood of Sandy Hook had been foggy, and both steamers spent the night preceding collision at anchor; the Georgic outside of Gedney's Channel, the Finance southwesterly of the "Spit Buoy" near the southwest spit of Flynn's Knoll (her exact posi-

tion will be considered hereafter). Shortly before 7 a. m. of the 26th the fog lightened, and each vessel hove up anchor and proceeded on her way. Each was in charge of a Sandy Hook pilot, each was fully manned and competently officered, and no substantial complaint has been made by any party as to improper sounding of fog signals or lack of lookouts properly stationed. Each vessel had a leadsman attending to his duties, and the Georgic, besides maintaining men stationed on bridge and forecastle head, as is customary on entering port, had an officer and two men in the crow's nest, which is situated between 30 and 40 feet above deck, about 50 feet from the bow and approximately 100 feet forward of the bridge. After leaving their respective anchorages both vessels were disappointed in finding the fog grow thicker as they advanced. To me the testimony from the Georgic's crow's nest is of great importance. It shows that the fog lay low where it was thickest, and where this collision occurred— i. e., to the westward of the turn out of Gedney's, and into the Main Ship Channel; and indeed, if it be not matter of common knowledge that fog encountered in patches and upon the whole clearing with the morning sun does lie low, it is at least common knowledge that such is the usual testimony in collision causes. Therefore I find no difficulty in believing that Second Officer Hague, in the crow's nest of the Georgic, is the witness of education and intelligence who had the best opportunity of observing the manner in which the two vessels neared each other.

The disputed questions of fact relate to: (a) The respective speeds of the approaching vessels; (b) the courses steered by them while so approaching; and (c) the place of collision.

Preliminary to consideration of these points it may be noted as a matter not open to discussion that the Finance sank and for a long time remained at a point between 750 and 800 yards, very slightly west of north (true) of bell buoy No. 5. It is also admitted by all that the tide movement in this region on high water (and the tide was approximately high between 7 and 8 a. m. of November 26th) is north or a little to the west thereof. One method, therefore, of ascertaining the place of collision is to discover from the evidence how long the Finance remained off the bottom after collision, and how far she traveled with the tide before she stopped by contact with the mud.

Inasmuch as the Finance contends that the Georgic's bow pierced her side to a depth of about 8 feet and that although just before collision her engines were put full speed ahead, she had attained little if any headway through the water, it is an assumption obviously favorable to the Finance that after being struck her progress to the eastward was practically nil. As it is also admittedly true that the vessels were in contact but for a moment, it follows that the only movement of the Finance after collision was her tide drift. Irrespective, therefore, of the very important question whether this collision happened on the southerly or northerly side of the Main Ship Channel, it is obvious that a line from bell buoy No. 5 through the wreck of the Finance must run approximately through the point of contact between the two ships. It follows from this that knowing where and when the navigation of both vessels just before collision began, we know the distance that each

traveled in a time capable of accurate measurement on the part of the Georgic and of approximate estimation on that of the Finance.

The speed of the Georgic from the time she weighed anchor outside of Gedney's Channel until she had Buoy N B 2 abeam at 7:28 a. m. seems to me wholly unimportant. She had come up Gedney's seeing the buoys on each side. There was no difficulty in such navigation, and no reason appears why she should not have gone faster than even the highest speed imputed to her at that time by the claimants. The language of Brown, J., in the Ludvig Holberg, 157 U. S. at page 67, 15 Sup. Ct. at page 480 (39 L. Ed. 620), is with slight changes applicable to this litigation. It was there said that if a colliding steamer "ran 20 miles an hour down to the Narrows, and was running dead slow at the time she first heard the whistle (of the other vessel), fault could not be imputed to her for her previous speed." If, by the Georgic's time, the moment of collision be taken as early as 7:44, that vessel required 16 minutes to travel from Buoy N B 2 to the point of collision. This distance cannot be (no matter on which side of the channel the disaster occurred) more than 2,200 yards, and computation gives an average speed for the distance of less than four knots per hour. But her engines, which were at slow when passing out of Gedney's Channel, were put dead slow at 7:36, slow again at 7:38, dead slow at 7:39, and stop at 7:41. This shows an almost continually decreasing speed and tends strongly to confirm the repeated statements of her officers that she barely had steerage way (or words to that effect) shortly after her engines were stopped. At 7:42 the engines were reversed, and I find nothing in the testimony to discredit the statements that at the time of collision the backwater from her propeller had nearly come abreast of her bridge and the leadsman had obtained an up and down cast of his line.

I do not think that the rule of moderate speed in a fog could have been more strictly adhered to than it was by the Georgic, and I find nothing in the evidence to justify the assertion that her speed was excessive. This view is, I think, strongly confirmed by the fact, sworn to by almost every witness and contradicted by none, that although the Georgic came in contact with the Finance at an angle of certainly not over 4 points, the port sides of the two vessels never closed in on each other, which must mean that the force of collision was not sufficient to swing the Finance against the Georgic. If the blow had been such an one as a vessel of the Georgic's bulk would surely have delivered if more than barely moving, their swinging together could not have been prevented. The speed of the Finance cannot be gauged by any evidence so satisfactory or reliable. Undoubtedly at the moment of collision her engines were going full speed ahead. How long they had been in such operation is variously stated from half a minute to two minutes. What they had been doing before they were put full speed ahead is a question that can only be decided by considering testimony which varies from that of the pilot, who says that they had been at rest for from three to five minutes, to that of one of the engineers who says that they had been going full astern and were put full ahead without any stop order between. I can discover no ground

for a more definite finding than this, viz., there is a general consensus of evidence from the Finance that she was actually under way for about 35 minutes before collision. In that time she traversed a distance of approximately 5,200 yards. Her average speed was therefore less than four knots, and she had so far overcome her headway before collision as to make some very competent observers on the Georgic believe that if she had not gone full speed ahead collision might have been avoided by the Georgic's passing the Finance's bow. This unfriendly criticism, in connection with the opinions of the Finance's witnesses, convinces me that the speed of the latter vessel was not excessive—i. e., she was able to control her movements if she otherwise obeyed the law; but I do not think that when the vessels were within sight of each other she was so nearly stopped as was the Georgic.

Inquiries as to the courses of the two vessels and the exact place of their collision may be pursued together, for solution depends upon the same evidence. No reason appears to me to doubt the evidence from the Georgic as to the courses steered by that vessel after Buoy N B 2 was abeam at 7:28 a. m. She steered the channel course of west by south and passed within less than a ship's length of Buoy N 2½ on that course. How near she passed to Buoy N B 2 is a question upon which her own witnesses are not fully agreed, and her pilot gives a greater distance than do the other observers.

Estimates of time and distance are so notoriously difficult to form, so hard to remember, and so wholly unreliable as to have become proverbial for uncertainty. Yet one result of this is that uniformity in such estimates is often ground of just suspicion, and it is rather from an average of apparently honest impressions than from positive evidence that the result must be reached. I am therefore of opinion that the Georgic passed N B 2 probably somewhat closer than she did 2½, and adhered to her channel course of west by south until very shortly before collision when she ported a point. This course brings the Georgic well over to the northerly side of the channel, and that course I believe she held, not only because the weight of the evidence shows it, but because it was a natural—i. e., the easiest—thing to do. By creeping along the north side of the channel and maintaining the channel compass course she would keep in sight of the line of red buoys and thereby most readily escape the danger of going aground.

In ascertaining the course of the Finance the exact location of her anchorage is important. It has been given as an estimated distance from the "Spit Buoy," and also by bearings on the Spit Buoy and Black Buoy No. 1. The indicated positions are not identical by about 150 yards, but the difference does not seem to me very material, for it is abundantly testified to from the Finance that after she got under way at least one and probably two of the red buoys on the north side of the channel were seen not far distant on her port side.

The steamship Corona had been lying at anchor not far from the Finance; she went out ahead of the latter vessel, and her pilot has testified in this case. He proceeded to sea by picking his way from

red buoy to red buoy along the northerly side of the channel, a proceeding as illegal as it is usual; and I remain of the opinion that the same usual procedure was in the mind of the pilot of the Finance when he actually got under way at or a little before 7 a. m. of November 26th. It is to be remembered that although the master and pilot of the Finance declare that it was ultimately their intention to go out by the south channel (a proceeding permitted by the light draft of their vessel) such was not the purpose of the pilot until he had been under way for approximately half an hour, and the reason he gives for changing his mind and trying for the south channel is that he heard the Georgic's whistle.

The compass courses that he gives in explanation are as follows: An easterly course from anchorage until the bell on Sandy Hook bore about south southeast; then east by north (which is the channel course for Gedney's) until he heard "the steamer coming.in," and then "I told the captain we would keep to the southward so as to keep out of the way of ships coming in through Gedney's; we intended to go out through the south channel." And he accordingly changed his course to east southeast, and maintained that until collision was inevitable. The pilot's statement that he laid an east by north course when the bell on Sandy Hook bore about south southeast is repudiated as a mistake by counsel for his own ship; but I find in the testimony no other or more definite statement as to when the easterly course was changed to east by north. If·the Finance started from either of the positions assigned as her anchorage by her own witnesses, the sooner she laid an east by north course the nearer she was to the line of the red buoys and the northerly side of the channel. Starting from the same anchorage the longer an easterly course was maintained the further to the southward would her east southeast course get her at the moment of collision.

An effort has been made in argument to show that the Finance's pilot did not mean the bell on Sandy Hook, but "the bell buoy off the point of the Hook"—i. e.,·bell buoy No. 5; but this argument is coupled with the assertion that the Finance had been upon her east southeast course for at least five minutes before she sighted the Georgic. This statement of the course of the Finance is open to criticism in at least two particulars: (a) It is so inaccurate and indefinite a statement that when coming from the pilot in charge of navigation it invites doubt as to his accuracy or reliability or both; and (b) if taken, as counsel for the Finance urged it upon the court, it places the point of collision within 200 yards or less of bell buoy No. 5. I cannot accept the story of the Finance as to courses as interpreted by her own counsel, because (1) as above stated it was more natural for her to follow the Corona; (2) it is wholly inconsistent with the credible and coherent statements regarding the courses of the Georgic; and (3) if the collision happened anywhere near (i. e., within 200 yards of) bell buoy No. 5, it is impossible that the tide movement could have carried the Finance to the place where she now lies sunk within the time she remained afloat. The question as to how long the Finance remained afloat is therefore important, and almost every witness from that vessel has been asked to·give·his opinion. Opinions

on such a point are peculiarly open to the criticism made in The St. Louis, 98 Fed., at page 751, 39 C. C. A., at page 262; i. e., the witnesses are "speaking from impressions rather than from any tangible evidential facts. The time for observation consisted of [a] few seconds, fraught with apprehension and excitement."

The recorded opinions in this case run as high as twelve minutes, but first officer Peterson said:

"When the boats pulled apart, I don't know whether the Finance went any way at all. I think she dropped right down. She sank just about where she struck. There wasn't very much change."

And Captain Mowbray declares that:

"After the vessel struck it was about five minutes before the Finance's stern touched the bottom, and it may be took five minutes more for her to sink";

while the bow lookout says:

"The tide swung the Finance a little till she struck the bottom. * * * The Finance lay just like a log; she didn't move nowheres, but just where the tide took her."

The comparisons and similes of the witnesses are of more importance than their guesses at time. Considering how many of the people on the Finance had to jump for their lives, and that when her stern was once on the bottom she could scarcely have moved at all, I am unable to believe (as above stated) that the place of collision contended for by counsel for the Finance is either proven or possible. It may also be noted that the soundings made by the leadsmen on both steamers are more readily suggested by the chart on the northerly side of the channel than anywhere else, and the sounding said to have been taken by the leadsman on the Finance just at collision or immediately thereafter cannot possibly be identified elsewhere than well to the northerly edge of the channel. Without regard, therefore, to just where or when the Finance's turn to east southeast occurred, nor how far she traveled upon that course, it must be found that she was, when in collision with the Georgic, on the wrong side of the channel, having gone there with deliberation and without necessity, and was therefore at fault. The Sea King, 114 Fed. 535, 52 C. C. A. 349; The No. 4, 161 Fed. 847, 88 C. C. A. 665.

There came a time when the vessels saw each other; how far apart they then were has been the subject of much testimony and more discussion. A fair average of the estimates is in my judgment between a length and a length and a half of the Georgic. It is plain that the first person on the Georgic to see the Finance was Officer Hague in the crow's nest. He saw her after he had heard her whistle once, and that whistle was on the starboard bow. He first saw her masts, and thinks it was two or three minutes from the time he saw them until he perceived her hull. He saw two masts and they were "a little open across our bow," and when the hull appeared in sight about 600 feet away the Finance was plainly crossing the bow of the Georgic from starboard to port, i. e. going in a general southerly direction. That this was a situation of very great danger is too plain for comment. Hague

made prompt report of what he had heard and seen, and the responsibility for acting upon his report rested solely on Nichols, the pilot in charge of the Georgic. · Whether he heard, or hearing paid any attention to the report from the crow's nest, is not plain from the evidence, but it is clear from his own evidence that he heard the Finance's whistle two or three minutes before he sighted her, and the whistle sounded about a point on the starboard bow. The third whistle he heard nearly ahead, and he then stopped his engines and ported his wheel. This he admits was "with reference to the third whistle."

Dougherty, the pilot of the Finance, is even more definite in his statements: He had himself piloted the Georgic several times, and could and did distinguish her whistle as that of a White Star ship. He thought he heard this familiar sound about three points on his port bow, and it grew louder as the steamer got closer. He first heard the whistle he believes about 10 minutes before collision, but he repeatedly states that he heard it four or five times, on his port bow and getting closer, before he stopped his engines. It is thus positively asserted by both pilots that each distinctly heard forward of his beam the fog signal of a vessel the position of which was not ascertained. Yet Nichols heard that whistle repeated three times, and Dougherty four or five times, before they respectively stopped the engines of the valuable vessels they had in charge. I think this is a plain violation, by the pilot of each vessel, of article 16 of the Inland Rules. That article is mandatory in that it declares that a steam vessel in the position above described "shall, so far as the circumstances of the case admit, stop her engines." I see nothing in the circumstances revealed by the evidence which prevented stopping the engines of each vessel. Quite naturally counsel for both steamers have said very little about this point, which is pressed upon the court by the cargo owners. It is asserted as an authoritative declaration that the Supreme Court said in The Ludvig Holberg, supra, page 68 of 157 U. S., at page 480 of 15 Sup. Ct. (39 L. Ed. 620):

"No case has ever held that a steamer was obliged to stop at the first signal heard by her unless its proximity be such as to indicate immediate danger."

Undoubtedly that was the rule under the international regulations of March 3, 1885, article 13; but article 16 of the International Rules of 1890 (identical with the same article of the Inland Rules of 1897) has been differently construed in decisions binding upon me. In The St. Louis, supra, the Circuit Court of Appeals for this circuit held a much less flagrant violation of this article ground for the application of the rule:

"That whenever it appears that one of the vessels (in collision) has neglected the usual and proper measures of precaution the burden is upon her to show that the collision was not owing to her neglect." 98 Fed. 752, 39 C. C. A. 263.

In Re Clyde S. S. Co. (D. C.) 134 Fed., at page 97, it was held that a failure to observe the precaution imposed by this article "creates a presumption of fault"; and the same rule was applied in El Monte, 114 Fed. 796. In the case last cited at page 800 is a reference to the pro-

ceedings of the Maritime Conference which adopted this rule, and I entirely agree with Judge Adams that it was put on the statute book on the recommendation of that conference in order that stopping at the first whistle should be imperative and because the conference and the Legislature did not wish "to leave too much to the navigator's judgment." Any violation thereof should in my opinion create a very strong presumption of fault, and cast upon the offender the burden of showing by clear testimony that his error did not contribute to collision and subsequent damage. The rule is very forcibly stated in The H. F. Dimock, 77 Fed. 230, 23 C. C. A. 123, and I perceive nothing opposed to it in Dunton v. Allan S. S. Co., 119 Fed. 590, 55 C. C. A. 541, for in that case it plainly appears that the engines of the steamship were stopped "immediately upon hearing" the first sound signal of the vessel with which she afterwards came in collision. Thus a presumption of fault attaches to both vessels for violation of the statutory rule. Neither has borne the burden laid on her thereby. On the contrary, the moderate speed at which each was going when the other's whistles were heard, and the narrow margin by which the bounds of safety were overstepped, are proof conclusive that, even with the Finance on the wrong side of the channel, injury would have been avoided if the law had been obeyed.

In this as in so many other collision cases arising in New York Harbor, the result is reached with mortification, in that I am convinced that the pilots thrust by local law upon vessels of great cost, well manned and equipped, and carrying valuable lives, are guilty, not of errors of judgment only, but of total ignorance of the fundamental statutes affecting their calling. The depositions of all the pilots testifying in this cause have been scanned in vain to find any indication of knowledge by them of such matters as the narrow channel rule, or of even a statutory recommendation to stop the engines promptly on hearing a fog whistle forward of the beam.

For the reasons indicated, a decree will be entered, permitting limitation and declaring both steamers at fault.