[No. 26595. Department Two. August 23, 1937.]

SEA PRODUCTS COMPANY, *Respondent,* v. PUGET SOUND
NAVIGATION COMPANY, *Appellant.*[1]

*Bogle, Bogle & Gates* and *Claude E. Wakefield,* for
appellant.

*Shorett, Shorett & Taylor,* for respondent.

STEINERT, C. J.—A collision between a motor ferry-
boat and a scow being towed by a tug-boat, in the

[1] Reported in 71 P. (2d) 43.

waters of Puget sound, resulted in damages to the scow and the loss of a substantial part of its cargo. The owner of the tug-boat and scow brought action to recover damages for the loss sustained. The cause was tried to a jury, resulting in a verdict for plaintiff. From a judgment on the verdict, the defendant has appealed.

The assignments of error are grouped under two heads: (1) Errors in denying a motion for nonsuit and, subsequently, a motion for directed verdict, both based on the ground that respondent was guilty of contributory negligence as a matter of law; and (2) errors in giving certain instructions and refusing to give certain others requested by appellant. The conclusion that we have reached upon the first group of errors renders consideration of the second unnecessary.

On the morning of October 1, 1935, the tug-boat "Ohio" with a scow in tow was on a voyage from Whidby island to respondent's dock located in the West waterway of Seattle harbor at the lower end of Elliott bay. The tow-line connecting the tug and scow was one hundred or one hundred fifty feet in length. A thick fog enveloped Puget sound, including Elliott bay, at the time, affording a visibility of only about two hundred or two hundred fifty feet.

The tug and scow left Four Mile Rock, north of Seattle, at about 10:30 a. m. and were proceeding to their destination upon a course described as east southeast. The speed at which the tug started across Elliott bay was about four knots an hour. Shortly before 11:30 a. m., the tug and scow arrived at a point near the middle of the bay and opposite to, and west of, Colman dock, which is located on the waterfront of Seattle.

At about 11:15 a. m. of the same day, the motor ferry-boat "Kalakala" left Colman dock, bound for

Bremerton. After backing out of the slip and turning around, the "Kalakala" set upon a course described as west by south, three-quarters south. Shortly thereafter, the "Kalakala" was compelled to stop her engines in order to permit a tramp steamer to cross in front of her. She then resumed her course and proceeded ahead. The courses of the ferry-boat and tug-boat, respectively projected, intersected at an obtuse angle at a point in the bay about two-thirds of the distance from Colman dock to the bell-buoy opposite Duwamish head.

While proceeding upon her course from Colman dock, the "Kalakala" intermittently blew her whistle, giving the required fog signal, and the same was heard by those on the tug-boat at least five minutes before the collision. During this same interval the fog signals from other vessels in the vicinity were heard by the captain of the tug. One of these vessels was directly ahead of the tug, and another was astern of it.

When the captain of the tug first heard the whistle of the "Kalakala," he slowed down to about two knots an hour, and, then, as the sounds came closer, further reduced his speed to about one knot per hour. However, at no time prior to the collision did he stop his engine in response either to the whistle of the "Kalakala" or to that of the vessel directly ahead of him.

The vital factor in this case is the relative positions of the tug and ferry-boat during the last five minutes before the collision. Upon that factor depends the answer to the question whether the operator of the tug was guilty of contributory negligence as a matter of law.

Respondent's witnesses testified generally, upon direct examination, that the sound of the "Kalakala's"

whistle at all times came from abreast or amidships of the tug and from the direction of Colman dock. However, when specifically interrogated by respective counsel, upon direct and cross examination, as to the exact points of location of the two vessels, the witnesses carefully and definitely fixed, by reference to a map of Seattle harbor drawn to scale, their relative positions and courses from the time that the whistle of the "Kalakala" was first heard by the tug, up to the time of the collision. All question and doubt upon that issue were thus definitely determined and resolved. A reference to the map, which is in evidence, shows clearly and unmistakably that Colman dock and the entire course of the "Kalakala" up to within a short distance of the place of collision were "forward of the beam" of the tug as it approached the point of intersection of the two courses.

When those in charge of the tug were finally able to discern the "Kalakala" emerging through the fog, the ferry-boat was about two hundred feet distant and was headed broadside for the tug. The scow, it will be remembered, was a hundred or a hundred fifty feet back of the tug. Sensing that the "Kalakala" would very probably cut in between the tug and scow, the captain of the tug gave orders to cast loose the tow immediately, which was done. The tug proceeded forward in safety, but the scow, upon being released of its directing power, sheered to port and shortly thereafter collided with the ferry-boat, sustaining the damages for which recovery is now sought.

There was evidence, although disputed, from which the jury was warranted in finding that the "Kalakala" was traveling at an excessive rate of speed under the circumstances, and, for the purposes of this case, we will assume that such was the fact. The question before us, however, is not whether the "Kalakala" was

negligent, but whether the tug was guilty of contributory negligence as a matter of law.

■ Inasmuch as the collision took place within navigable waters, the rights of the parties are measured by the admiralty law, even though the action be one at common law for damages. *Novak v. Fishermen's Packing Corp.*, 184 Wash. 526, 52 P. (2d) 336; *Chelentis v. Luckenbach S. S. Co.*, 247 U. S. 372, 38 S. Ct. 501, 62 L. Ed. 1171; *Puget Sound Nav. Co. v. Nelson*, 41 F. (2d) (C. C. A. 9) 356; *Chesley v. Nantasket Beach Steamboat Co.*, 179 Mass. 469, 61 N. E. 50.

■ By act of Congress passed June 7, 1897 (30 Stat. at Large, chap. 4), certain rules and regulations were promulgated for the prevention of collisions upon navigable waters and were made mandatory upon all vessels navigating harbors, rivers and inland waters, with certain exceptions not material here.

Art. 16 of the act (30 Stat. 99; U. S. C. title 33, § 192) provides:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

We are here particularly concerned with the second paragraph of Art. 16 just quoted.

The term "steam-vessel," as used in the act, includes any vessel propelled by machinery. 30 Stat., ch. 4, p. 96, U. S. C. title 33, § 155. Inasmuch as the tug and the ferry-boat involved in this case were both propelled by machinery, the statute applies to each of them.

The term "forward of her beam," as applied to a particular vessel, has reference to all those directions and that territory which lie ahead of a line drawn at right angles to the sides, and through the center, of such vessel.

The requirement that a vessel stop its engines immediately upon hearing the first fog signal "apparently forward of her beam" is strict and imperative and does not permit any latitude of discretion.

"Under the present rules no latitude of judgment is allowed the navigator either as to the necessity or the time for stopping them. *The rule is imperative that the engines be stopped immediately the first fog signal is heard apparently forward of the beam.*" LaBoyteaux, The Rules of the Road at Sea, page 88.

The rule thus enjoined is sustained by the authorities. *The El Monte,* 114 Fed. 796; *The Seneca,* 159 Fed. 578, 580 (affirmed in 170 Fed. (C. C. A. 2) 937); *The Georgic,* 180 Fed. 863.

In the case of *The Selja* (*Lie v. San Francisco & Portland S. S. Co.*), 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726, the United States supreme court emphasized the distinction between the first and second paragraphs of Art. 16, in this language:

"The most cursory reader of this rule must see that while the first paragraph of it gives to the navigator discretion as to what shall be 'moderate speed' in a fog, the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him. The difficulty of locating the direction or source from which sounds proceed in a fog, renders it not necessary to dwell upon the purpose and obvious wisdom of this second paragraph of the rule."

As thus expressed, the purpose of the rule is not only to prevent collisions, but also to forbid the risk of collisions.

In order to make the rule effective, as well as significant, the courts have uniformly held that a violation of, or a failure to observe, it creates a presumption of fault and casts upon the offender the burden of showing by clear testimony that his error did not contribute to the collision and subsequent damage. *The Pennsylvania,* 86 U. S. (19 Wallace) 125, 136, 22 L. Ed. 148; *The Martello,* 153 U. S. 64, 38 L. Ed. 637; *The H. F. Dimock,* 77 Fed. 226 (C. C. A. 1), 23 C. C. A. 123; *The Georgic,* 180 Fed. 863, 871; *The Beaver* (C. C. A. 9), 219 Fed. 134, 138; *Dorrington v. Detroit* (C. C. A. 6), 223 Fed. 232, 244, 138 C. C. A. 474; *New York & Cuba Mail S. S. Co. v. United States* (C. C. A. 2), 16 F. (2d) 945; *Puget Sound Nav. Co. v. Nelson,* 41 F. (2d) 356; *The Edward E. Loomis,* 86 F. (2d) 705, 707, 1937 A. M. C. 54 (C. C. A. 2, 1936); *The Catalina,* 18 Fed. Supp. 461; *Novak v. Fishermen's Packing Corp.,* 184 Wash. 526, 52 P. (2d) 336; 24 R. C. L., p. 1277, § 373.

█ The courts have also had frequent occasion to consider the provision, "a vessel the position of which is not ascertained," regarded either as an integral part of the statutory rule prescribed by Art. 16, or else as part of a precautionary measure enjoined by judicial pronouncement. With the evident view of enforcing strict obedience to a rule designed to prevent collisions, the courts have indicated that a vessel which fails to stop her engines on hearing a whistle forward of her beam or otherwise take proper precautions assumes the burden of proving that the position and course of the approaching vessel were definitely and exactly known. *The City of New York,* 147 U. S. 72, 84, 37 L. Ed. 84; *The Martello,* 153 U. S. 64, 38 L. Ed. 637; *The Umbria,* 166 U. S. 404, 41 L. Ed. 1053; *The Kirby Hall,* 8 P. D. (Eng.) 71; *The Bernard Hall,* 9 Asp. M. C. (N. S.) (Eng.) 300; *The Britannia,* 10 Asp.

M. C. (N. S.) (Eng.) 65, 68. The rationale, if not the express wording, of these decisions is that the position of the approaching vessel must be ascertained by actual sight or so accurately determined by repeated hearing of her signals that the possibility of error has been eliminated. LaBoyteaux, The Rules of the Road at Sea, p. 97 *et seq.*

The phrase "so far as the circumstances of the case admit" presents no difficulty in this case. That clause was inserted in the rule to meet exceptional cases where the stopping of the engine would place the vessel in danger from some peril other than the approaching vessel. No such circumstance is suggested here.

■ Applying the rules to which we have just alluded to the facts of this case, we are fully convinced that respondent is not entitled to recover.

Under the evidence, the signals from the "Kalakala" emanated and were heard from points which were actually "forward of the beam" of the tug-boat. Aside from that, the whistle from a third vessel was heard directly ahead of the tug. The most that can be said for the operators of the tug is that the position of the "Kalakala," which was known to be approaching, was not definitely ascertained. In either or any event, it was the duty of the tug to stop its engine and *then* navigate with caution until danger of collision was over.

The position of the scow in tow was even more precarious than that of the tug, for being over a hundred feet in the rear, it had a greater distance to travel in order to pass ahead of the "Kalakala."

The failure of the tug to stop its engine upon hearing the respective whistles forward of its beam was a violation of the rule laid down by Art. 16 and therefore constituted contributory negligence as a matter of law.

The owner of the tug was thus put to the burden of proving by clear testimony that the error of the tug did not contribute to the collision and consequent damage. But there was no proof of any fact exculpating the tug, and, in the light of what actually occurred, there could be none. Had the tug stopped its engine seasonably and then navigated with proper caution, it would not have crossed the course of the "Kalakala" and the collision between the scow and the ferry-boat would, in all certainty, never have happened. It is obvious that the collision was directly attributable to the fault of the tug, regardless of any negligence of the ferry-boat.

The judgment is reversed, with direction to the trial court to dismiss the action.

ROBINSON, HOLCOMB, BEALS, and GERAGHTY, JJ., concur.